# JITTER

321 North Clark Street
Suite 1100
Chicago, IL 60654

Meg D. Karnig
312.795.3215 direct
312.372.5520 main
mkarnig@littler.com

July 14, 2022

**VIA EEOC PORTAL**

Investigator Christina Hernandez
Equal Employment Opportunity Commission

**Re: Kathleen Maldonado v. OMNOVA**
    **EEOC Charge No. 460-2022-04028**

Dear Investigator Hernandez:

We represent the Respondent OMNOVA Solutions, Inc. (the "Company") in the above captioned matter. This letter serves as the Company's position statement responding to the Charge filed by former employee Kathleen Maldonado.[1] In her Charge, Ms. Maldonado alleges that the Company failed to accommodate her and that she was discriminated against based on her alleged disability.

At the outset, the Company wants to ensure EEOC's understanding that Ms. Maldonado signed a valid and effective waiver and release of all of the claims that are now asserted in her Charge. In return for and in consideration of this waiver, Ms. Maldonado received severance pay

---

[1] The statement of facts and position set forth herein are based on the undersigned's knowledge of the facts at the time of this statement of position. The Company in no way waives its right to present new or additional facts or arguments based upon subsequently acquired information or evidence. Further, this statement of position is being submitted to assist the agency in its efforts to investigate or conciliate. While believed to be true and correct in all respects, this statement of position does not constitute an affidavit and is not intended to be used as evidence of any kind in any commission or court proceeding in connection with the above-referenced Charge. As additional facts likely would be uncovered through discovery or following a full investigation, the Company in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by submitting this position statement, the Company does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Charging Party's allegations. The Company requests that any efforts to contact its current managers be directed through its counsel. Further, the Company provides this document with the understanding that its contents and attachments are confidential and proprietary and that its contents will neither be disclosed nor given to Charging Party, her attorneys, or her representatives.

and other severance benefits of considerable value. Her Charge must be dismissed on this basis alone.

Alternatively, the Charge must be dismissed due to its total lack of merit. The Company denies that it failed to accommodate Ms. Maldonado's alleged disability and that it or any of its representatives discriminated against Ms. Maldonado based on her alleged disability. To the contrary, Ms. Maldonado was discharged after failing to return to work once released by her doctor, and following repeated and long-standing attendance and performance issues unrelated to her disability. In fact, Ms. Maldonado was on a performance improvement plan and had also received a final warning before she ever requested any kind of leave in April 2021. Moreover, the Company worked with Ms. Maldonado to accommodate her requests for leave on many occasions, despite significant attendance and performance issues in the months leading up to her requests for leave. In particular, the Company granted her initial request for intermittent leave, her later request for a continuous leave, and her repeated requests for extension of the continuous leave. Ultimately, Ms. Maldonado's doctor cleared her to return to work on Monday, August 2, 2021. However, despite her doctor's clearance, Ms. Maldonado failed to return to work on August 2, and failed again to return to work on August 3, 2021. Because she failed to return to work once released by her doctor, and in light of her repeated and long-standing attendance and performance issues, Ms. Maldonado was discharged on August 3, 2021. Accordingly, Ms. Maldonado's Charge must be dismissed.

## I. FACTUAL BACKGROUND

### A. The Company's Business

The Company is a global innovator of performance-enhancing chemistries and surfaces used in products for a variety of commercial, industrial, and residential applications.[2] The Company's US corporate office is located in Beachwood, Ohio, just outside of Cleveland. The Company has a number of facilities located throughout the United States, including the production facility in Stafford, Texas, where Ms. Maldonado was employed. The Stafford facility currently has approximately 14 employees.

---

[2] Since April 1, 2020, the Company has been a part of the Synthomer group of companies, owned and controlled by Synthomer plc, a company organized under the laws of England and Wales and traded on the London stock exchange. Synthomer is one of the world's foremost suppliers of aqueous polymers and has leadership positions in many markets. With the acquisition of the OMNOVA, Synthomer grew its global manufacturing network, expanded its product portfolio and boosted its geographical presence, allowing it to better serve new and existing customers around the world. Synthomer has its operational headquarters in London. Synthomer employs more than 4,750 employees across more than 53 locations including 38 production sites worldwide.

long maintained and enforced a comprehensive equal opportunity policy. In its policy, the Company affirms its commitment to make employment decisions without regard to race, color, religion, national origin, gender, age, disability, medical condition, parental status, or other protected categories. Further, the Company provides employees several avenues for pursuing complaints of discrimination, and strictly prohibits retaliation of any kind for raising concerns under this policy. *See Equal Employment Policy,* attached as **Exhibit 1**.

### C. Ms. Maldonado's Employment History and Significant Performance and Attendance Issues

Ms. Maldonado was hired by the Company on September 30, 2019, as Office Manager. Ms. Maldonado remained in this position until her employment was terminated in August 2021 under the circumstances described more fully below. As Office Manager, Ms. Maldonado reported to the Company's VP of Energy Solutions, Jeff Chaapel, and Production Manager, Matt Tarr. In this position, Ms. Maldonado was responsible for several job duties, including but not limited to management of the front desk, admitting delivery drivers into the building, assistance with invoicing, permits, payment of bills, and general site management.

Unfortunately, Ms. Maldonado had difficulty performing nearly every aspect of the role. After just over one year of employment, on October 30, 2020, Ms. Maldonado was placed on a performance improvement plan ("PIP"). *See Maldonado Performance Improvement Plan,* attached as **Exhibit 2**. The performance improvement plan outlined the following areas for improvement:

- ξ Attendance,
- ξ Adhering to the Company's "Golden rules,"
- ξ Ensuring all drivers sign all appropriate paperwork for deliveries,
- ξ Taking proper notes from inquiry calls,
- ξ Answering the gate when people arrive or call,
- ξ Ensuring all guests sign in and out, and
- ξ Wearing proper PPE at the plant.

Ms. Maldonado was informed that she would be discharged if she did not improve in the specified areas and successfully meet the objectives of her role.

Despite several months of performance coaching from Mr. Chaapel and Mr. Tarr, Ms. Maldonado continued to underperform in her Office Manager role. On several occasions, Ms. Maldonado worked partial days without approval. She left drivers waiting at the front desk, ignored instructions from her manager, neglected time sensitive mail, mistakenly scanned her

manager's credit card statement to another employee, mistakenly sent a coverall invoice to the backflow contractor, failed to wear safety glasses in the plant, and did not account for sick days on her timecard.

performance issues. Ms. Maldonado was also required to attend weekly meetings with Mr. Chaapel to monitor her performance and was informed that lack of acceptable improvement would result in her termination.

Unfortunately, Ms. Maldonado continued to struggle in adequately performing her job. Indeed, in her very first weekly performance review following the Final Notice on March 17, Mr. Chaapel and Mr. Tarr told her that her attention to detail and attendance issues required significant improvement. *See 3/17/21 Email from J. Chaapel to M. Spradling re Weekly Performance Review: Kathy Maldonado*, attached as **Exhibit 4**. Several recent performance and attendance incidents were discussed with her at that meeting, including but not limited to the following:

*[handwritten: Never properly trained]*

- Ms. Maldonado failed to properly set up a vendor, causing significant delays and double work for the team;

- Ms. Maldonado got confused when scheduling a third-party fire extinguisher inspector and inadvertently scheduled the fire marshal for an audit; and

- Ms. Maldonado's continued inability to show up on time every day and to provide notice when she is unable to show up on time. *[handwritten: → came in at 7:30]*

*[handwritten left margin: Never confused because I knew trucks would be lined up. Never trained]*

### D. Ms. Maldonado's Requests for Leave

In late April 2021, after it had already become abundantly clear to everyone [ including Ms. Maldonado ] that she was unable to adequately perform her job duties, Ms. Maldonado informed the Company for the first time that she needed time off to attend to an undisclosed medical condition. In accordance with Company policy, Ms. Maldonado contacted OMNOVA's third-party leave administrator, Sedgwick Claims Management Services, Inc., (Sedgwick).[3]

Although Ms. Maldonado communicated her absence to Mr. Chaapel and Human Resources

*[handwritten: Because HR advised me of this. He no longer works for the company.]*

---

[3] OMNOVA's leave policies and procedures, including leave under the FMLA, are administered by Sedgwick. As the Leave of Absence Administrator, Sedgwick is responsible for administering all of OMNOVA's policies, which includes, *inter alia*, notifying employees of their eligibility under the FMLA and Company leave programs, sending all communications about leaves of absence, reminding employees of due dates, and collecting all necessary documents and other information from employees to support their leaves of absence and returned to work.

Manager, Monica Spradling, the doctor's notes, medical diagnoses, FMLA analysis, and grant of leaves of absence were handled entirely by Sedgwick.

Specifically, Mr. Chaapel did not have access to Sedgwick documents or any information about Ms. Maldonado's medical diagnosis. While Ms. Spradling had access to Sedgwick documents in her capacity as an HR Manager, she never accessed Ms. Maldonado's Sedgwick file nor reviewed her medical information. Mr. Chaapel and Ms. Spradling were aware only that Ms.

Initial FMLA leave was granted and intermittent leave continued from April 26, 2021, through May 26, 2021. *See 6/8/21 Sedgwick FMLA Approval Letter,* attached as **Exhibit 5**. Ms. Maldonado's doctor specified that she should be permitted to use intermittent leave for up to five episodes every three weeks, and that each episode might last up to three days. Despite these limitations, Ms. Maldonado used intermittent leave every single day between April 26 and May 26, 2021. *See Maldonado Time Detail,* attached as **Exhibit 6**.

During this same period, Ms. Maldonado was eventually approved for short term disability benefits, meaning that she was paid 100% of her normal pay while she was out on leave. *See 6/16/21 Sedgwick STD Approval,* attached as **Exhibit 7**. However, she failed to properly update Sedgwick on her leave status. When the Company was advised by Sedgwick that Ms. Maldonado had used intermittent leave beyond the limits authorized by her doctor and realized that the Company had paid short term disability for that time, the Company promptly sent Ms. Maldonado a letter on June 25 explaining the overpayment for short term disability benefits and advising her that the excess payments would be deducted from her next paycheck. *See 6/25/21 Letter re PTO and Pay Changes,* attached as **Exhibit 8**. Ms. Maldonado never disputed these calculations.

On June 3, Ms. Maldonado's doctor advised Sedgwick that she had been hospitalized and requested a continuous leave of absence status. *See 6/2/21 Sedgwick AUD Diagnosis and Leave Recommendation,* attached as **Exhibit 9.** On June 16, Ms. Maldonado was approved for a continuous leave of absence with an expected return-to-work date of June 24, 2021. *See* **Exhibit 7**. On June 22, 2021, Ms. Maldonado informed Ms. Spradling that she would be in the hospital through July 16, 2021 and would be in therapy from July 19 through July 27, 2021. Again, Ms. Spradling was not informed about Ms. Maldonado's diagnosis, the reason for her hospitalization, or the reason she was in therapy. On June 25, 2021, Ms. Maldonado's doctor recommended to Sedgwick an extension of her continuous leave through July 19, 2021, for inpatient and outpatient treatment of Alcohol Use Disorder. *See 6/25/21 Sedgwick LOA Extension,* attached as **Exhibit 10**. Ms. Spradling and Mr. Chaapel were informed that Ms. Maldonado's leave would be extended, however they were not informed about her diagnosis.

On July 13, 2021, Ms. Maldonado informed Ms. Spradling that she wanted to return to work part-time on July 28, 2021. Ms. Spradling explained that the Company would be unable to accommodate Ms. Maldonado's part-time request, but that Ms. Maldonado would continue to

littler.com
Investigator Christina Hernandez
July 14, 2022
Page 6

receive short term disability if she submitted the correct paperwork to Sedgwick. *See 7/14/21 Email from M. Spradling to J. Chaapel,* attached as **Exhibit 11**. On July 19, 2021, Ms. Maldonado's doctor recommended to Sedgwick an extension of her leave through August 2, 2021. *See 7/19/21 Sedgwick LOA Extension,* attached as **Exhibit 12**. On July 22, 2021, Ms. Maldonado's doctor cleared her to return to work full time with no restrictions on August 2, 2021. *See 7/22/21 Sedgwick RTW Form,* attached as **Exhibit 13**.

Despite her doctor's unconditional clearance for her to return to work with no restrictions, Ms. Maldonado called in sick on August 2, 2021, because she had "caught a bug while swimming" the previous day. *See 8/2/21 Email from J. Chaapel to M. Spradling re Kathy Maldonado,*

### E. The Company Discharges Ms. Maldonado

Due to Ms. Maldonado's failure to return to work on August 2 even though she had been released to return to work on that date by her doctor, her failure again to return to work the next day, August 3, and in light of her very serious past attendance and performance issues, the Company discharged Ms. Maldonado on August 3, 2021. As noted above, Ms. Maldonado had received both a PIP and a final warning weeks before she ever requested leave that were based on her attendance and performance issues, but had failed to improve despite being given several opportunities to do so.

### F. Ms. Maldonado Voluntarily and For Adequate Consideration Waives All Claims Against the Company

*Never trained properly*

Despite the fact that Ms. Maldonado was terminated for poor performance and poor attendance, and as yet another good will gesture to assist her with her transition to new employment, the Company offered Ms. Maldonado severance pay and other severance benefits pursuant to the terms of a Separation Agreement. Ms. Maldonado signed the Separation Agreement on August 16, 2021. *See 8/16/21 Maldonado Separation Agreement*, attached as **Exhibit 16**. Under the terms of the Separation Agreement, in exchange for a full release of claims against the Company, Ms. Maldonado received $3,844.80 of separation pay, $2,049.00 of premium payments for COBRA, and access to outplacement services. As a part of the Separation Agreement, Ms. Maldonado voluntarily agreed to fully release the Company from any and all potential claims, including the follow claims:

*Covid*

> *"(a) all claims arising ... relating to Employee's employment with or separation of employment from Released Parties; (b) all claims for compensation or benefits ... including salary, commissions, bonuses, vacation pay, expense reimbursements, severance pay, fringe benefits, options to purchase shares, restricted share units or any other ownership interests in a Released Party; (c) all claims for breach of any*

littler.com
Investigator Christina Hernandez
July 14, 2022
Page 7

> *employment or severance agreement between Employee and Released Parties, or any other breach of contract, wrongful termination, breach of the implied covenant of good faith and fair dealing or breach of any policy, plan or practice; [...] and (f) all claims (including claims of discrimination, harassment, retaliation, attorneys fees, expenses or otherwise) that were or could have been asserted by Employee ... in any federal, state, or local court, commission, or agency, or under any federal, state, local employment services or other law, regulation, ordinance, constitutional provision, executive order or other source of law including ... the Americans with Disabilities Act."*

Ms. Maldonado also voluntarily waived "all entitlement to any form of monetary relief arising from a charge Employee or others may file" with the EEOC, SEC or other governmental agency. *See* **Exhibit 16**.

As a threshold matter, Ms. Maldonado waived the claims she now asserts in her Charge, and waived her entitlement to any corresponding monetary relief, when she voluntarily signed the Separation Agreement on August 16, 2021. There is no question that this waiver and general release of claims is valid and enforceable. Courts have held that an individual may validly release potential ADA claims if they do so knowingly and voluntarily. *See e.g. Howard v. Health Care Services Corp.*, 2008 WL 1968776 (N.D. Ill. 2008). Ms. Maldonado knowingly and voluntarily released the Company from any claims of discrimination under the ADA. The Separation Agreement specifically states that Ms. Maldonado waives all claims that could have been asserted in any federal, state, or local court, commission, or agency, including claims under the ADA. Ms. Maldonado was given twenty-one days to consider the terms of the Separation Agreement. Directly above Ms. Maldonado's signature line, the Agreement contains bolded all-caps language advising Ms. Maldonado to consult with an attorney prior to signing the Agreement. The all-caps bolded language also clearly states that Ms. Maldonado is waiving claims of any potential legal claims against the Company. By signing the Separation Agreement, Ms. Maldonado also waived entitlement to any monetary relief arising from a charge filed with the EEOC or other governmental agencies. On this basis alone, the Charge should be dismissed in its entirety.

### B. Ms. Maldonado's Failure to Accommodate Claim Fails

Alternatively, the Charge must be dismissed due to its complete lack of merit. A prima facie claim for failure to accommodate an alleged disability requires that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Wolf v. Lowe's Cos.*, CIVIL ACTION No. 4:16-CV-01560 (S.D. Tex.

littler.com
Investigator Christina Hernandez
July 14, 2022
Page 8

Mar. 13, 2018) (citing *Neely v. PSEG Tex., Ltd.*, 735 F.3d 242, 247 (5th Cir. 2013)). Ms. Maldonado's claim fails on all three prongs.

First, it is clear from the facts recited above that Ms. Maldonado was not qualified for her position. The ADA does not require an employer to accommodate an employee who is not qualified for the job. *Hypes v. First Commerce Corp.*, 134 F.3d 712, 716 (5th Cir.1998). Long before she first requested any leave in April of 2021, Ms. Maldonado had demonstrated serious and consistent issues with poor performance and poor attendance. As noted above, she was placed on a PIP in October 2020 for these reasons. Failing to improve after she was placed on a PIP, she was then placed on a Final Notice in March 2021. During this entire period, she demonstrated an inability to manage the simplest aspects of her position, repeated failure to improve in designated areas for improvement, and a failure or refusal to comply with attendance expectations. **Never should have been submitted**

As it relates specifically to Ms. Maldonado's attendance issues, there is no question that her poor attendance renders her unqualified for her job. An employee's work attendance is an essential function of most jobs, especially when the position is interactive and involves a

before she ever asked for a leave of absence in April 2021. Thereafter, Ms. Maldonado was released by her doctor to return to work without restrictions on August 2 but failed to do so, and called in sick on August 2 and August 3. Clearly, the combination of all of these undisputed facts establishes that Ms. Maldonado was not qualified to perform her job.

Second, it is equally clear that the person who made the decision to terminate Ms. Maldonado – Mr. Chaapel – had no knowledge of Ms. Maldonado's Alcohol Use Disorder or any other alleged disability. All OMNOVA leave requests are submitted through Sedgwick, the Company's third-party leave administrator. Sedgwick is solely responsible for administering all of OMNOVA's leave policies, notifying employees of their eligibility under the FMLA and Company leave programs, sending all communications about leaves of absence, reminding employees of due dates, and collecting all necessary documents and other information from employees to support their leaves of absence and return to work. Mr. Chaapel had no knowledge of Ms. Maldonado's health issues or alleged disability outside of the fact that she took a leave of absence. Absent such knowledge, Mr. Chaapel obviously could not have based his termination decision on that information.

Lastly, the Company did not fail to accommodate Ms. Maldonado's alleged disability. In fact, the Company granted essentially all of Ms. Maldonado's requests for leave, including her initial request for intermittent leave, later request for continuous leave, and subsequent requests to extend her continuous leave. The only request denied by the Company was Ms. Maldonado's July 13 request to return to work part time which was unsupported by medical certification. At that time, Ms. Maldonado was informed that she would continue to receive short term disability and other leave benefits if she submitted the requisite paperwork through Sedgwick. Ms. Maldonado's

leave was extended once more before her doctor certified her to return to work full time without accommodation on August 2. In short, Ms. Maldonado's certified requests for leave and accommodation were all granted. Given these undisputed facts, it is clear that the Company fully accommodated Ms. Maldonado's alleged disability at every turn.

### C. Ms. Maldonado Cannot Make Out a Prima Facie Case of Disability Discrimination

To establish a prima facie case of disability discrimination, Ms. Maldonado must show: (1) she is disabled or is regarded as disabled; (2) she is qualified for the job; (3) she was subjected to an adverse employment action on account of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees. *McInnis v. Alamo Community College Dist*, 207 F.3d 276 (5th Cir. 2000) (citing *Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997). Once again, Ms. Maldonado's disability discrimination claim fails on all four prongs.

First, Ms. Maldonado is unable to show that she was regarded as disabled. As discussed above, the person who made the decision to terminate her employment – Mr. Chaapel – had no knowledge of Ms. Maldonado's Alcohol Use Disorder or any other alleged disability.

Second, Ms. Maldonado cannot show that she was qualified for her position. As discussed

She was discharged in August 2021 because of her unreliable attendance and inconsistent performance issues.

Third, Ms. Maldonado is unable to prove that she suffered an adverse employment action as a result of her disability. Ms. Maldonado's performance and attendance issues, placement on a Performance Improvement Plan, and later Final Notice all predated her requests for leave and accommodation. As summarized above, her discharge was the direct result of her repeated attendance issues, her inability to manage the simplest aspects of her position, and her failure to improve in areas designated for improvement. There is absolutely no evidence that her termination was based in whole or in part on any alleged disability.

Lastly, Ms. Maldonado is unable to show that she was treated less favorably than non disabled employees. Ms. Maldonado does not allege that she was treated less favorably than non disabled employees, nor does she provide any similarly situated comparators outside of her protected class who were treated more favorably in comparable circumstances. All employees are expected to comply with the performance and attendance expectations of their position. In the absence of any evidence to the contrary, Ms. Maldonado cannot establish her discrimination claim.

littler.com
Investigator Christina
Hernandez July 14, 2022
Page 10

## III. CONCLUSION

For all of the foregoing reasons, Ms. Maldonado's Charge is wholly without merit. The Company respectfully requests that the Charge be dismissed in its entirety.

Please contact me if you have any further questions or need additional relevant information.

Sincerely,

Meg D. Karnig

Attorney at Law

¹MDK

OMNOVA Solutions Inc. is vitally concerned with the challenges of providing equal employment opportunities for all persons regardless of race, color, age, gender, sexual orientation, religion, disability, national origin, military or veteran status, or any other characteristic protected by federal, state or local law. Where required by law or regulation, we will undertake goodfaith efforts to contract with suppliers, contractors, subcontractors and/or service providers that meet the definition of a Small Business Concern, a Small Disadvantaged Business Concern, and a Women-Owned Small Business Concern.

We endorse the principles and philosophy of equal employment opportunities for all persons. We are working constantly and diligently to make equal employment opportunities, in fact, a reality. To this end, we wish to reaffirm the established Corporate Policy of OMNOVA.

OMNOVA will not discriminate in any of its personnel decisions against any employee or applicant for employment for which they are qualified on account of such employee's or applicant's race, color, age, religion, sexual orientation, gender, physical or mental disability, national origin, military or veteran status, or any other characteristic protected by federal, state or local law. These decisions include, but are not restricted to recruitment and recruiting advertising, employment, transfer, demotion, promotion, layoff, return from layoff, termination, rates of pay or other forms of compensation and benefits, selection for training including apprenticeship, tuition assistance, social and recreational programs.

The Company's policy is to provide to all employees a work environment conducive to productivity and free from all forms of discrimination or harassment.

Harassment is a form of discrimination that undermines the integrity of the employment relationship. No employee should be subjected to unsolicited and unwelcome verbal, physical, or sexual overtures or conduct, which substantially interfere with his or her job performance or create an intimidating, hostile, or offensive working environment. Such conduct, whether involving supervisory or non-supervisory personnel, is specifically prohibited.

No employee should imply or threaten that an applicant or employee's "co-operation" of a sexual nature (or refusal thereof) will have any effect on the individual's employment, assignment, compensation, advancement, career development, or any other condition of employment. Violation of the prohibitions contained in this paragraph may result in termination for cause.

Created on 06.11.13

# STATEMENT OF COMPANY POLICY

OMNOVA Solutions Inc. is vitally concerned with the challenges of providing equal employment opportunities for all persons regardless of race, color, age, gender,

characteristic protected by federal, state or local law. Where required by law or regulation, we will undertake goodfaith efforts to contract with suppliers, contractors, subcontractors and/or service providers that meet the definition of a Small Business Concern, a Small Disadvantaged Business Concern, and a Women-Owned Small Business Concern.

We endorse the principles and philosophy of equal employment opportunities for all persons. We are working constantly and diligently to make equal employment opportunities, in fact, a reality. To this end, we wish to reaffirm the established Corporate Policy of OMNOVA.

OMNOVA will not discriminate in any of its personnel decisions against any employee or applicant for employment for which they are qualified on account of such employee's or applicant's race, color, age, religion, sexual orientation, gender, physical or mental disability, national origin, military or veteran status, or any other characteristic protected by federal, state or local law. These decisions include, but are not restricted to recruitment and recruiting advertising, employment, transfer, demotion, promotion, layoff, return from layoff, termination, rates of pay or other forms of compensation and benefits, selection for training including apprenticeship, tuition assistance, social and recreational programs.

The Company's policy is to provide to all employees a work environment conducive to productivity and free from all forms of discrimination or harassment.

Harassment is a form of discrimination that undermines the integrity of the employment relationship. No employee should be subjected to unsolicited and unwelcome verbal, physical, or sexual overtures or conduct, which substantially interfere with his or her job performance or create an intimidating, hostile, or offensive working environment. Such conduct, whether involving supervisory or non-supervisory personnel, is specifically prohibited.

No employee should imply or threaten that an applicant or employee's "co-operation" of a sexual nature (or refusal thereof) will have any effect on the individual's employment, assignment, compensation, advancement, career development, or any other condition of employment. Violation of the prohibitions contained in this paragraph may result in termination for cause.

Created on 06.11.13

## FAIR EMPLOYMENT PRACTICES

It is an OMNOVA core value to treat people with respect, dignity and fairness and to strive to provide a work environment in which all employees can reach their potential.

As part of its commitment to fair employment practices, OMNOVA's policy is to provide employment opportunities free of discrimination or harassment.

Discrimination is treating a person more or less favorably with respect to his or her employment (including recruiting, hiring, training, salary and promotion) than you otherwise would because of his or her race, gender, color, religion, national origin, age, sexual orientation, disability, or other non-job-related personal characteristic.

Harassment is any behavior related to a person's race, gender, color, religion, national

Fair employment practices also means
records. Access to employee records may onl
legitimate reason to have access.

K•

• Take personal responsibility for  assuring
  your conduct is free of any  actions that
  constitute discrimination or  harassment.

• Base personnel decisions in the
  workplace on merit and treat fellow
  employees with respect, dignity and
  fairness at all times.

• Take action to address any situation
  where you or another employee has
  not been treated consistent with
  OMNOVA's commitment to fair
  employment practices.

• Read OMNOVA's Fair Employment
  Practices Directive.

**DON'T**

omeone else's
o take action if you
nay be discrimination or
violation of this Policy.

sive remarks, unwelcome
es or verbal or physical
reates a fearful or hostile
ient.

dential employee records
oper business reason.

**DON'T**

• Assume it is someone else's
  responsibility to take action if you
  believe there may be discrimination or
  harassment in violation of this Policy.

• Tolerate offensive remarks, unwelcome
  sexual advances or verbal or physical
  conduct that creates a fearful or hostile
  work environment.

• Disclose confidential employee records
  except for a proper business reason.

# EXHIBIT 2

Dear Kathy,

Based on our recent discussion about your performance, I have made the decision to initiate a Performance Improvement Plan. This process is designed to facilitate a discussion between us regarding performance to be improved and/or behavior to be corrected in order for you to meet expectations.

Below, I have identified specific areas and/or instances that require improvement, as well as the steps that you and I need to take in order for you to successfully meet the objectives of your role. We will meet weekly to review your progress to determine whether appropriate progress is being made. If appropriate progress is not being made, further action up to and including termination of employment will be considered.

These items come from my own observations and discussions with Matt Tarr:

* Unpredictable attendance – while there is some flexibility during this time when it comes to working from home, it is clear your role can only be effectively done from the office whenever reasonable. Providing little to no notice on days when Matt is counting on you makes work for everyone more difficult. Added to this are the reasons cited for staying home – waiting on a/c repair men, stubbing toe). This makes us all question your desire to do your job.
* Not properly following the Golden Rules (being the gate keeper for contractors to not start working before a permit is completed).
* Ensuring the drivers sign all appropriate paperwork for deliveries.
* Failing to take proper notes from inquiry calls (who called, what do they want, who are they calling from, who do we need to contact within the company to answer their question).
* Ensuring the you are answering the gate when people arrive or call.
* Ensuring that all guests sign in and out
* Ensuring to wear proper PPE at the plant, steel toed shoes outside of yellow line in the plant

Both Matt and I are committed to helping you correct these actions and achieve an acceptable level of job performance.

natures:

Employees Signature                                          Date

_(signature)_

Supervisor Signature                                          Date  10/1/20

October 30, 2020

# EXHIBIT 3



Based on
Improvemen
Lack of acce

Signatures:

Employee Signature

Kathy,

We have discussed during these meetings, there were items and periods of time in which you initiating a performance improvement plan on October 30, 2020, we have met periodically over at least several months to ensure you are actively working towards achieving the appropriate level of performance required of your role.

adequately addressed key areas in need of improvement. However, it has not proven sustainable, of your overall performance slipping since we started 2021.

Note that time the following has taken place:

12/28-12/30 — Found to be not working full 8 hour days without communicating to myself of this.

Left time sensitive local regulatory permit mail on your desk from 12/19 to 1/12 when the response was due 15 days after the letter was sent

Ops Manager Matt Tarr has instructed you multiple times not to text him (or Steve) when a driver arrives, but to come to them and let them know. On 1/19 you texted both of them instead of physically informing them — driver was left to wait while no one else knew he was on site

You mistakenly scanned Matt's credit card statement to another employee

You mistakenly sent a coverall invoice to the backflow contractor

On 1/19, you stepped out into the plant where corrosives were being handled with safety glasses in your hand

On 2/5 you did not account for a sick day on your timecard. I had to remind you.

n 2/9 you did not advise a contractor to reverse park

these ongoing issues, this letter is your Final Notice as part of your Performance t Plan. Beginning 3/11/2021 we will have weekly meetings to monitor your performance. ptable improvement will result in your termination.

# EXHIBIT 4

Miles was ignoring Me, No proper training

**From:** Chaapel, Jeff
**To:** Spradling, Monica; Huff, Levi
**Subject:** Weekly Performance Review: Kathy Maldonado
**Date:** Wednesday, March 17, 2021 2:28:49 PM
**Attachments:** image001.png
image003.png

Monica,

Since detailed documentation was requested during the PIP process, thought I would simply drop you a note after each of our meetings….

Had the first of our weekly performance check-in's with Kathy, since we gave her the final notice. Reminded her of the need to pay attention to detail, be accurate in her activities – with vendors, internal stakeholders, truck drivers, etc.

No reply



*Was not confused*

*Head conflicting instruction I'm an office Manager*

Matt Tart provided an example of attention to detail, when she got confused with scheduling a third party fire extinguisher inspector. She did not understand and inadvertently scheduled the fire marshal for an audit. It was resolved, but could have been an issue.

Talked about the need to be committed to showing up on-time every day, and providing notice when that cannot occur.

She has expressed a desire to improve her performance, and have committed to walking her through any specific task if she is not completely comfortable with what she is doing. We have helped her in this regard multiple times, but will see to what extent she decides to reach out and/or improve her results.

Will continue these meetings weekly.

Thanks,

Jeff Chaapel | Vice President | Oil & Gas | ☐
Phone: 832-432-2113 | Mobile: 832-525-6804
E-Mail: jeff.chaapel@synthomer.com | Web: www.synthomer.com

Join us on

Address: OMNOVA Solutions Inc., a Synthomer company | 13347 Pike Road, Stafford, Texas 77477 | USA Synthomer takes data privacy seriously. Please read the Fair Processing Notice referred to in our Privacy Policy to learn more.

*Came in at 7:30 just continued Had me guess*

*Not true! Questions & concerns made me feel stupid.*

*MATTS The Operations Manager*

# EXHIBIT 5

June 8, 2021

Kathleen E Maldonado
12700 Stafford Rd
Apt 137
Stafford, TX 77477

Claim No: 2021-0042618
Employer: Synthomer

Re: Family and Medical Leave Act (FMLA) Benefits - Approval

Dear Kathleen:

We have made a determination on your request for leave. Please see the following benefits and their respective status below:

| Policy | Absence Type | Benefit Start Date | Benefit End Date | Status |
|--------|--------------|--------------------|--------------------|--------|

Further details regarding your claim are outlined below.

Your request for Intermittent leave under FMLA due to your own serious health condition has been approved from April 26, 2021 through May 26, 2021.

The time taken for this leave will be deducted from your FMLA entitlement of twelve (12) workweeks of leave per twelve (12)-month period.

You are approved to use intermittent leave as follows:

- **5 episodes every 3 weeks. Each episode can last up to 3 days.**

Absences that exceed this approved frequency and duration will require additional information from your health care provider or, in the case of leave to care for a covered family member, your covered family member's health care provider.

You will be required to furnish medical recertification of your your own serious health condition if you request leave beyond this approved leave period. Your employer may request recertification no more often than every 30 days and only in connection with an absence by the employee. If the medical certification indicates that the minimum duration of the condition is more than 30 days, your employer must wait until that minimum duration expires before requesting a recertification. If such certification is not received, your continued FMLA leave may be delayed or denied until certification is provided.

Determination Letter   York Risk Services Group, Inc., a Sedgwick company   Page 1 of 3
This approval is for job protection under FMLA and will run concurrently with other paid benefit programs offered by your employer.

You will be required to substitute accrued paid leave for unpaid FMLA leave. Please refer to your employer for additional information.

If you have any questions, please feel free to contact me at, (888) 436-9530, Extension 50426 to discuss any questions.

Sincerely,
Katrina Thomas
Disability Claim Specialist

cc: Synthomer Human Resources Department



Determination Letter    York Risk Services Group, Inc., a Sedgwick company    Page 3 of 3

# EXHIBIT 6

## Time Detail    Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:
6/15/2022 2:42:45 PM
6/15/2022 2:42PM GMT-04:00 210080
Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Employee: Maldonado, Kathleen E ID: 209947 Time Zone: Central Status: Terminated Status Date:
8/3/2021 Pay Rule: OMN-Hourly Bi-weekly Primary Account Start End
STAFFORD/19560/12034/-/-/-/- 9/23/2019 Forever

Date/Time Apply To In Punch In Exc Out Punch Out Exc Money
Override
Adj/Ent
Day
Totaled
Cum. Tot.
Amount
Amount
Amount
Amount
Amount
Amount
Xfr/Move: Account Comment Xfr: Work Rule
10/1/2020 8:00 AM Hours Worked 8.00 8.00 10/2/2020 8:00 AM Hours Worked 8.00 16.00 10/5/2020 8:00 AM Hours
Worked 8.00 24.00 10/6/2020 8:00 AM Hours Worked 8.00 32.00 10/7/2020 8:00 AM Hours Worked 8.00 40.00

10/19/2020 8:00 AM Hours Worked 8.00 104.00 10/20/2020 8:00 AM Hours Worked 8.00 112.00 10/21/2020 8:00 AM Hours Worked 8.00 120.00 10/22/2020 8:00 AM Hours Worked 8.00 128.00 10/23/2020 8:00 AM Hours Worked 8.00 136.00 10/26/2020 8:00 AM Hours Worked 8.00 144.00 10/27/2020 8:00 AM Hours Worked 8.00 152.00 10/28/2020 8:00 AM Hours Worked 8.00 160.00 10/29/2020 8:00 AM Hours Worked 8.00 168.00 10/30/2020 8:00 AM Hours Worked 8.00 176.00 11/2/2020 8:00 AM Hours Worked 8.00 184.00 11/3/2020 8:00 AM Hours Worked 8.00 192.00 11/4/2020 8:00 AM Hours Worked 8.00 200.00 11/5/2020 8:00 AM Hours Worked 8.00 208.00 11/6/2020 8:00 AM Hours Worked 8.00 216.00 11/9/2020 8:00 AM Hours Worked 8.00 224.00 11/10/2020 8:00 AM Hours Worked 8.00 232.00 11/11/2020 8:00 AM Hours Worked 8.00 240.00 11/12/2020 8:00 AM Hours Worked 8.00 248.00 11/13/2020 8:00 AM Hours Worked 8.00 256.00 11/16/2020 8:00 AM Hours Worked 8.00 264.00 11/17/2020 8:00 AM Hours Worked 8.00 272.00 11/18/2020 8:00 AM Hours Worked 8.00 280.00 11/19/2020 8:00 AM Hours Worked 8.00 288.00 11/20/2020 8:00 AM Hours Worked 8.00 296.00 11/23/2020 8:00 AM Hours Worked 8.00 304.00 11/24/2020 8:00 AM Hours Worked 8.00 312.00 11/25/2020 8:00 AM Hours Worked 8.00 320.00

Page 1

## Time Detail Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:

6/15/2022 2:42:45 PM

6/15/2022 2:42PM GMT-04:00 210080

Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Date/Time Apply To In Punch In Exc Out Punch Out Exc Money
Override
Adj/Ent
Day
Totaled
Cum. Tot.
Amount
Amount
Amount
Amount
Amount
Amount
Xfr/Move: Account Comment Xfr: Work Rule
11/26/2020 12:00 AM Thanksgiving Day 8.00 328.00 11/27/2020 12:00 AM Thanksgiving Day After 8.00 336.00 11/30/2020 8:00 AM Hours Worked 8.00 344.00 12/1/2020 8:00 AM Hours Worked 8.00 352.00 12/2/2020 8:00 AM Hours Worked 8.00 360.00 12/3/2020 8:00 AM Hours Worked 8.00 368.00 12/4/2020 8:00 AM Hours Worked 8.00 376.00 12/7/2020 8:00 AM Hours Worked 8.00 384.00 12/8/2020 8:00 AM Hours Worked 8.00 392.00 12/9/2020 8:00 AM Hours Worked 8.00 400.00 12/10/2020 8:00 AM Hours Worked 8.00 408.00 12/11/2020 8:00 AM Hours Worked 8.00 416.00 12/14/2020 8:00 AM Hours Worked 8.00 424.00 12/15/2020 8:00 AM Hours Worked 8.00 432.00 12/16/2020 8:00 AM Hours Worked 8.00 440.00 12/17/2020 8:00 AM Hours Worked 8.00 448.00 12/18/2020 8:00 AM Hours Worked 8.00 456.00 12/21/2020 8:00 AM Hours Worked 8.00 464.00 12/22/2020 8:00 AM Hours Worked 8.00 472.00 12/23/2020 8:00 AM Hours Worked 8.00 480.00 12/24/2020 12:00 AM Christmas Eve 8.00 488.00 12/25/2020 12:00 AM Christmas 8.00 496.00 12/28/2020 8:00 AM Hours Worked 7.00 503.00 12/29/2020 8:00 AM Hours Worked 7.00 510.00 12/30/2020 8:00 AM Hours Worked 7.00 517.00 12/31/2020 12:00 AM New Year's Eve 8.00 525.00 1/1/2021 12:00 AM New Year's 8.00 533.00 1/4/2021 12:00 AM Floating Holiday 8.00 541.00 1/5/2021 12:00 AM Floating Holiday 8.00 549.00 1/6/2021 8:00 AM Hours Worked 8.00 557.00 1/7/2021 8:00 AM Hours Worked 8.00 565.00 1/8/2021 8:00 AM Hours Worked 8.00 573.00 1/11/2021 8:00 AM Hours Worked 8.00 581.00 1/12/2021 8:00 AM Hours Worked 8.00 589.00 1/13/2021 8:00 AM Hours Worked 8.00 597.00 1/14/2021 8:00 AM Hours Worked 8.00 605.00 1/15/2021 8:00 AM Hours Worked 8.00 613.00 1/18/2021 8:00 AM Hours Worked 8.00 621.00 1/19/2021 8:00 AM Hours Worked 8.00 629.00 1/20/2021 8:00 AM Hours Worked 8.00 637.00 1/21/2021 8:00 AM Hours Worked 8.00 645.00 1/22/2021 8:00 AM Hours Worked 8.00 653.00 1/25/2021 8:00 AM Hours Worked 8.00 661.00 1/26/2021 8:00 AM Hours Worked 8.00 669.00 1/27/2021 8:00 AM Hours Worked 8.00 677.00 1/28/2021 8:00 AM Hours Worked 8.00 685.00

Page 2

## Time Detail Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:

6/15/2022 2:42:45 PM

6/15/2022 2:42PM GMT-04:00 210080

Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Date/Time Apply To In Punch In Exc Out Punch Out Exc Money

Totaled
Cum. Tot.
Amount
Amount
Amount
Amount
Amount
Amount
Xfr/Move: Account Comment Xfr: Work Rule
1/29/2021 8:00 AM Hours Worked 8.00 693.00 2/1/2021 8:00 AM Hours Worked 0.00 693.00 2/1/2021 12:00 AM
PTO Unscheduled 8.00 701.00 2/2/2021 8:00 AM Hours Worked 8.00 709.00 2/3/2021 8:00 AM Hours Worked
717.00 2/4/2021 8:00 AM Hours Worked 8.00 725.00 2/5/2021 8:00 AM Hours Worked 8.00 733.00 2/8/2021 8:00 AM
Hours Worked 8.00 741.00 2/9/2021 8:00 AM Hours Worked 8.00 749.00 2/10/2021 8:00 AM Hours Worked 8.00
757.00 2/11/2021 8:00 AM Hours Worked 8.00 765.00 2/12/2021 8:00 AM Hours Worked 8.00 773.00 2/15/2021 8:00
AM Hours Worked 8.00 781.00 2/16/2021 8:00 AM Hours Worked 8.00 789.00 2/17/2021 8:00 AM Hours Worked
8.00 797.00 2/18/2021 8:00 AM Hours Worked 8.00 805.00 2/19/2021 8:00 AM Hours Worked 8.00 813.00 2/22/2021
8:00 AM Hours Worked 8.00 821.00 2/23/2021 12:00 AM PTO Unscheduled 8.00 829.00 2/24/2021 12:00 AM PTO
Unscheduled 8.00 837.00 2/25/2021 12:00 AM PTO Unscheduled 8.00 845.00 2/26/2021 12:00 AM PTO 8.00 853.00
3/1/2021 12:00 AM PTO 8.00 861.00 3/2/2021 8:00 AM Hours Worked 8.00 869.00 3/3/2021 8:00 AM Hours Worked
8.00 877.00 3/4/2021 8:00 AM Hours Worked 8.00 885.00 3/5/2021 8:00 AM Hours Worked 8.00 893.00 3/8/2021
12:00 AM PTO 8.00 901.00 3/9/2021 8:00 AM Hours Worked 8.00 909.00 3/10/2021 8:00 AM Hours Worked 8.00
917.00 3/11/2021 8:00 AM Hours Worked 8.00 925.00 3/12/2021 8:00 AM Hours Worked 8.00 933.00 3/15/2021 8:00
AM Hours Worked 8.00 941.00 3/16/2021 8:00 AM Hours Worked 8.00 949.00 3/17/2021 8:00 AM Hours Worked
8.00 957.00 3/18/2021 8:00 AM Hours Worked 8.00 965.00 3/19/2021 8:00 AM Hours Worked 8.00 973.00 3/22/2021
8:00 AM Hours Worked 8.00 981.00 3/23/2021 8:00 AM Hours Worked 8.00 989.00 3/24/2021 8:00 AM Hours
Worked 8.00 997.00 3/25/2021 8:00 AM Hours Worked 8.00 1,005.00 3/26/2021 8:00 AM Hours Worked 8.00
1,013.00 3/29/2021 8:00 AM Hours Worked 8.00 1,021.00 3/30/2021 8:00 AM Hours Worked 8.00 1,029.00
3/31/2021 8:00 AM Hours Worked 8.00 1,037.00 4/1/2021 8:00 AM Hours Worked 8.00 1,045.00

Page 3
## Time Detail Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:
6/15/2022 2:42:45 PM
6/15/2022 2:42PM GMT-04:00 210080
Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Date/Time Apply To In Punch In Exc Out Punch Out Exc Money
Override
Adj/Ent
Day
Totaled
Cum. Tot.
Amount
Amount
Amount
Amount
Amount
Amount
Xfr/Move: Account Comment Xfr: Work Rule
4/2/2021 8:00 AM Hours Worked 0.00 1,045.00 4/2/2021 12:00 AM Good Friday 8.00 1,053.00 4/5/2021 8:00 AM
Hours Worked 8.00 1,061.00 4/6/2021 8:00 AM Hours Worked 8.00 1,069.00 4/7/2021 8:00 AM Hours Worked 8.00
1,077.00 4/8/2021 8:00 AM Hours Worked 8.00 1,085.00 4/9/2021 8:00 AM Hours Worked 8.00 1,093.00 4/12/2021
8:00 AM Hours Worked 8.00 1,101.00 4/13/2021 8:00 AM Hours Worked 8.00 1,109.00 4/14/2021 8:00 AM Hours
Worked 8.00 1,117.00 4/15/2021 8:00 AM Hours Worked 8.00 1,125.00 4/16/2021 8:00 AM Hours Worked 8.00
1,133.00 4/19/2021 8:00 AM Hours Worked 8.00 1,141.00 4/20/2021 8:00 AM Hours Worked 8.00 1,149.00
4/21/2021 8:00 AM Hours Worked 8.00 1,157.00 4/22/2021 8:00 AM Hours Worked 8.00 1,165.00 4/23/2021 8:00 AM
Hours Worked 8.00 1,173.00 4/26/2021 12:00 AM PTO 8.00 1,181.00 4/27/2021 12:00 AM PTO 8.00 1,189.00
4/28/2021 12:00 AM PTO 8.00 1,197.00 4/29/2021 12:00 AM PTO 8.00 1,205.00 4/30/2021 12:00 AM PTO 8.00
1,213.00 5/3/2021 12:00 AM Absence - Unapproved Unpaid 8.00 1,221.00 Historical Edit
5/4/2021 12:00 AM Absence - Unapproved Unpaid 8.00 1,229.00 5/5/2021 12:00 AM Absence - Unapproved Unpaid
8.00 1,237.00 5/6/2021 12:00 AM Absence - Unapproved Unpaid 8.00 1,245.00 5/7/2021 12:00 AM Absence -
Unapproved Unpaid 8.00 1,253.00 5/10/2021 12:00 AM PTO 8.00 1,261.00 Historical Edit
5/11/2021 12:00 AM PTO 8.00 1,269.00 5/12/2021 12:00 AM PTO 8.00 1,277.00 5/13/2021 12:00 AM PTO 8.00
1,285.00 5/14/2021 12:00 AM PTO 8.00 1,293.00 5/17/2021 12:00 AM Absence - Unapproved Unpaid 8.00 1,301.00
Historical Edit

Absence - Approved Unpaid 8.00 1,333.00 5/24/2021 12:00 AM PTO 8.00 1,341.00 Historical Edit
5/25/2021 12:00 AM PTO 8.00 1,349.00 5/26/2021 12:00 AM PTO 8.00 1,357.00

Case 4:22-cv-04203   Document 12-9   Filed on 12/02/22 in TXSD   Page 22 of 27

Page 4
## Time Detail Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:
6/15/2022 2:42:45 PM

6/15/2022 2:42PM GMT-04:00 210080

Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Date/Time Apply To In Punch In Exc Out Punch Out Exc Money
Override
Adj/Ent
Day
Totaled
Cum. Tot.
Amount
Amount
Amount
Amount
Amount
Amount
Xfr/Move: Account Comment Xfr: Work Rule
5/27/2021 8:00 AM LV-STD 100 8.00 1,365.00 Historical Edit
5/28/2021 8:00 AM LV-STD 100 8.00 1,373.00 5/31/2021 12:00 AM Memorial Day 8.00 1,381.00 6/1/2021 12:00 AM
LV-STD 100 8.00 1,389.00 6/2/2021 12:00 AM LV-STD 100 8.00 1,397.00 6/3/2021 12:00 AM LV-STD 100 8.00
1,405.00 6/4/2021 12:00 AM LV-STD 100 8.00 1,413.00 6/7/2021 12:00 AM LV-STD 100 8.00 1,421.00 6/8/2021
12:00 AM LV-STD 100 8.00 1,429.00 6/9/2021 12:00 AM LV-STD 100 8.00 1,437.00 6/10/2021 12:00 AM LV-STD
100 8.00 1,445.00 6/11/2021 12:00 AM LV-STD 100 8.00 1,453.00 6/14/2021 12:00 AM LV-STD 100 8.00 1,461.00
Historical Edit

LV Self
6/15/2021 12:00 AM LV-STD 100 8.00 1,469.00 6/16/2021 12:00 AM LV-STD 100 8.00 1,477.00 6/17/2021 12:00 AM
LV-STD 100 8.00 1,485.00 6/18/2021 12:00 AM LV-STD 100 8.00 1,493.00 6/21/2021 12:00 AM LV-STD 100 8.00
1,501.00 LV Self
6/22/2021 12:00 AM LV-STD 100 8.00 1,509.00 6/23/2021 12:00 AM LV-STD 100 8.00 1,517.00 6/24/2021 12:00 AM
LV-STD 100 8.00 1,525.00 6/25/2021 12:00 AM LV-STD 100 8.00 1,533.00 6/28/2021 12:00 AM Absence - Approved
Unpaid 32.00
6/28/2021 12:00 AM LV-STD 100 8.00 1,541.00 6/29/2021 12:00 AM LV-STD 100 8.00 1,549.00 6/30/2021 12:00 AM
LV-STD 100 8.00 1,557.00 7/1/2021 12:00 AM LV-STD 100 8.00 1,565.00 7/2/2021 12:00 AM LV-STD 100 8.00
1,573.00 7/5/2021 12:00 AM Independence Day 07-05 8.00 1,581.00 7/6/2021 12:00 AM LV-STD 100 8.00 1,589.00
7/7/2021 12:00 AM LV-STD 100 8.00 1,597.00 7/8/2021 12:00 AM LV-STD 100 8.00 1,605.00 7/9/2021 12:00 AM
LV-STD 100 8.00 1,613.00 7/12/2021 12:00 AM LV-STD 100 8.00 1,621.00 7/13/2021 12:00 AM LV-STD 100 8.00
1,629.00 7/14/2021 12:00 AM LV-STD 100 8.00 1,637.00 7/15/2021 12:00 AM LV-STD 100 8.00 1,645.00 7/16/2021
12:00 AM LV-STD 100 8.00 1,653.00 7/19/2021 12:00 AM LV-STD 100 8.00 1,661.00 7/20/2021 12:00 AM LV-STD
100 8.00 1,669.00

Page 5
## Time Detail Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:
6/15/2022 2:42:45 PM

6/15/2022 2:42PM GMT-04:00 210080

Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Date/Time Apply To In Punch In Exc Out Punch Out Exc Money
Override
Adj/Ent
Day
Totaled
Cum. Tot.

Amount
Amount
Amount
Amount
Xfr/Move: Account Comment Xfr: Work Rule
7/21/2021 12:00 AM LV-STD 100 8.00 1,677.00 7/22/2021 12:00 AM LV-STD 100 8.00 1,685.00 7/23/2021 12:00 AM LV-STD 100 8.00 1,693.00 7/26/2021 12:00 AM LV-STD 100 8.00 1,701.00 7/27/2021 12:00 AM LV-STD 100 8.00 1,709.00 7/28/2021 12:00 AM LV-STD 100 8.00 1,717.00 7/29/2021 12:00 AM LV-STD 100 8.00 1,725.00 7/30/2021 12:00 AM LV-STD 100 8.00 1,733.00 8/2/2021 12:00 AM Absence - Unapproved Unpaid 8.00 1,741.00 Report Off 8/3/2021 12:00 AM Absence - Unapproved Unpaid 8.00 1,749.00 Report Off

Labor Account Summary Pay Code Hours Money Days STAFFORD/19560/12034/-/-/-/-

Absence - Approved Unpaid 40.00

Absence - Unapproved Unpaid 96.00

Floating Holiday 16.00

Holiday 72.00

LV-STD 100 328.00

PTO 128.00

PTO Unscheduled 32.00

Regular 1,037.00

Pay Code Summary Pay Code Hours Money Days Absence - Approved Unpaid 40.00

Absence - Unapproved Unpaid 96.00

Floating Holiday 16.00

Holiday 72.00

LV-STD 100 328.00

PTO 128.00

PTO Unscheduled 32.00

Regular 1,037.00

Totals: 1,749.00 $0.00 0.00 Page 6

# Time Detail Time Period:

Query:
10/1/2020 - 8/4/2021
Previously Selected Employee(s)
Data Up to Date: Executed on: Printed for:
6/15/2022 2:42:45 PM
6/15/2022 2:42PM GMT-04:00 210080
Actual/Adjusted: Insert Page Break After Each Employee: Show hours worked in this period only.

No

Pay Code Summary Hours Money Days Absence - Approved Unpaid 40.00
Absence - Unapproved Unpaid 96.00
Floating Holiday 16.00
Holiday 72.00
LV-STD 100 328.00
PTO 128.00
PTO Unscheduled 32.00
Regular 1,037.00
Totals: 1,749.00 $0.00 0.00 Total Number of Employees: 1

We have made a determination on your request for leave. Please see the following benefits and their respective status below:

| Policy | Absence Type | Benefit Start Date | Benefit End Date | Status |
|--------|--------------|--------------------|------------------|--------|
| STD | Continuous | May 27, 2021 | June 23, 2021 | Approved |

Further details regarding your claim are outlined below.

Your request for benefits under Synthomer Short Term Disability Plan has been approved from May 27, 2021 through June 23, 2021 for 160.00 hours based on the following:

- Your inability to perform at least one of the material duties of the job due to your own serious health condition.

- Synthomer has a 5 business day elimination period during which benefits are not payable. Elimination period means a continuous number of days you must be disabled before you are eligible to receive benefits.

- Your elimination period is May 27, 2021 through June 2, 2021. Your Short Term Disability benefits will begin on June 3, 2021.

Your expected return to work date is June 24, 2021.

Your employer requires that you provide a completed Release to Return to Work form prior to your return to work on June 24, 2021. A copy of this form is enclosed. Please have your treating provider complete the form and submit to Sedgwick via our secure toll-free fax number at (888) 436-9535. Also, present a copy to your employer upon your return to work. If this form is not received, your return to work may be delayed until certification is provided.

Determination Letter        York Risk Services Group, Inc., a Sedgwick company  Page 1 of 3

If you are able to return to work prior to this date, please contact your supervisor and Sedgwick immediately.

Under the Synthomer plan, if you cannot return to work on this date for medical reasons, you are required to have your treating physician provide the following medical information to support your continued disability from work. This medical information must provide us with an understanding of how your medical condition continues to affect your work capacity:

- All current medical records, including treatment or progress notes, surgical reports and diagnostic test results.
- Your physician's treatment plan.
- The enclosed Release to Return to Work form identifying any restrictions in your ability to perform your job duties.

The benefits will not be considered beyond **June 23, 2021** unless we receive additional medical information. Upon completion of our review, a determination will be made concerning any extension of benefits.

The timeframe approved may be different than what was originally requested by your healthcare provider. This determination has been made based on your medical condition and the essential functions of your job. Additional leave may be approved with the submission of additional medical information.

I will be contacting you to provide assistance throughout the leave process. If you have any

# EXHIBIT 8



June 25, 2021

Kathy Maldonado
12700 Stafford Rd
Apt. #137
Stafford, TX 77477

Kathy:

This letter is to inform you of changes that will be made to you PTO balance and upcoming pay on July 2nd.

**Intermittent FMLA** from April 26th – May 26th:
During this time, you were approved for 3 to 5 episodes (per every) 3 weeks. Each episode can last 2 days to 3 days. However, you took consecutive absences and did not update Sedgwick of these absences. As you are aware you are to update Sedgwick on your leave status. These absences will be considered unexcused.

**Short Term Disability (STD) payments** from May 3rd – May 26th:
The company also paid you STD for this time. Therefore, refer to the attached LOA calendar to show what should have occurred from May 3rd – May 26th. To make up for the STD payments (144 hours) that you received; without the proper documentation to support the claims we are deducting 64 hours of PTO from your PTO balance and deducting 80 hours from your next pay on July 2nd with a net pay of zero. The 80 hours will be considered unexcused absences.

**Next Steps:**
Contact Sedgwick to update your FMLA usage. Going forward make sure to keep Sedgwick up to date on any changes to your leave status.

If you have any additional questions, I can be reached at 330-628-6458

Sincerely,

Monica Spradling
HR Manager

# EXHIBIT 11

**From:** Spradling, Monica
**To:** Chappel, Jeff; Tare, Matt
**Cc:** Laube, Catherine
**Bcc:** Dunnavant, Dan
**Subject:** Kathy update
**Date:** Wednesday, July 14, 2021 7:42:00 AM
**Attachments:** image001.png
image003.png
image005.png

Hi Team,

I spoke with Kathy and explained to her that we cannot accommodate her part time request. I explained as long as she gets her paperwork into Sedgwick within the appropriate timeframe, provided by them

then she will continue her STD. I asked her when her physician will release her back to full time she said potentially September 1st.

I will keep you updated on her situation.

Thank you,

Monica

Monica Spradling | HR Manager | Human Resources |
Phone: 330-628-6458 | Mobile: 330-324-2166 | Fax: 330-439-1753
E-Mail: monica.spradling@synthomer.com | Web: www.synthomer.com

Join us on

2020 Award Recipient
*Second-Time Winner!*

Address: OMNOVA Solutions Inc., a Synthomer Company | 165 S. Cleveland Ave Mogadore, OH 44260 | United States
Synthomer takes data privacy seriously. Please read the Fair Processing Notice referred to in our Privacy Policy to learn more.

# EXHIBIT 12

# EXHIBIT 14

**From:** Chaapel, Jeff
**To:** Spradling, Monica
**Cc:** Tarr, Matt
**Subject:** Kathy Maldonado
**Date:** Monday, August 2, 2021 8:11:11 AM
**Attachments:** image001.png
                      image004.png

**Importance:** High

Monica,

As you know Kathy was expected to return to work this morning.

She just called and said she will not be in, maybe tomorrow.

She stated that she is throwing up, perhaps got a bug while swimming yesterday. Given I have not spoken with her in months, I asked what has been going on and if she is over whatever was keeping her out – simply said she would prefer to not to talk about it (was fine with me).

I will put the ball in your court, but hoping this helps us move forward with this whole situation. I asked her to notify me before hours tomorrow on if she will be well enough to return to work. Thanks,

Jeff Chaapel | Vice President | Oil & Gas | ☐
Phone: 832-432-2113 | Mobile: 832-525-6804
E-Mail: jeff.chaapel@synthomer.com | Web: www.synthomer.com
Join us on
Address: OMNOVA Solutions Inc., a Synthomer company | 13347 Pike Road, Stafford, Texas 77477 | USA Synthomer takes data privacy seriously. Please read the Fair Processing Notice referred to in our Privacy Policy to learn more.

# EXHIBIT 15

**From:** Chaapel, Jeff
**To:** Spradling, Monica
**Subject:** Kathy Maldonado
**Date:** Tuesday, August 3, 2021 7:14:42 AM
**Attachments:** image001.png
                      image002.png

Morning Monica,

Just a heads up, Kathy called in sick this morning.

Looking forward to hearing some positive developments today.

Thanks,

Jeff Chaapel | Vice President | Oil & Gas | ☐
Phone: 832-432-2113 | Mobile: 832-525-6804
E-Mail: jeff.chaapel@synthomer.com | Web: www.synthomer.com
Join us on
Address: OMNOVA Solutions Inc., a Synthomer company | 13347 Pike Road, Stafford, Texas 77477 | USA Synthomer takes data privacy seriously. Please read the Fair Processing Notice referred to in our Privacy Policy to learn more.

# EXHIBIT 16